UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SANCOM, INC., a South Dakota Corporation, | ) ) ) | CIV. 07-4107-KES |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| SPRINT COMMUNICATIONS COMPANY LIMITED PARTNERSHIP, a Delaware partnership, | ) ) ) ) ) | ORDER STAYING CASE AND REFERRING SEVERAL ISSUES TO FEDERAL COMMUNICATIONS COMMISSION |
| Defendant and Third-Party Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| FREE CONFERENCING CORPORATION OF AMERICA, a Nevada corporation, and TELEJUNCTIONS LLC, a California limited liability company, | ) ) ) ) ) ) | |
| Third-Party Defendants. | ) | |

Plaintiff, Sancom, Inc. (Sancom), moves the court to stay the case and refer several issues to the Federal Communications Commission (FCC) for resolution. Defendant, Sprint Communications Company Limited Partnership (Sprint), opposes the motion.

# BACKGROUND

## I. History of the Present Case

Sancom brought this action to recover amounts allegedly due under its federal and state tariffs. Sancom, a competitive local exchange carrier (CLEC) based in South Dakota, alleges that it provided originating and terminating access services to Sprint, an interexchange carrier (IXC), and billed Sprint the applicable rates set forth in Sancom's interstate access tariff filed with the FCC and intrastate access tariff filed with the South Dakota Public Utilities Commission (SDPUC).[1] Sancom alleges that Sprint has failed to pay the

---

[1] By way of background, there are two types of telecommunications providers, local exchange carriers (LECs) and IXCs. LECs provide the service and own the hardware that connects to individual customers in their local areas. By contrast, IXCs, commonly known as long-distance carriers, own the hardware that connects different local carriers. When an individual makes a long-distance telephone call, the call is originated on wires and facilities owned by the LEC serving the individual making the call and the call is terminated over wires and facilities owned by the LEC serving the individual receiving the call. IXCs pay "originating" and "terminating" access charges to the LECs that serve individuals who initiate and receive long-distance calls, respectively.

LECs are further divided into incumbent local exchange carriers (ILECs) and CLECs. "ILECs . . . operated as monopolies in a given area until the local phone service market was opened by the Telecommunications Act of 1996, which provided for the emergence of new LECs, the CLECs, to compete with the so-called 'Baby Bells.' " Advamtel, LLC v. AT&T Corp., 118 F. Supp. 2d 680, 681(E.D. Va. 2000). ILECs are required to file and maintain tariffs setting the rate for access service with the FCC (for purely interstate communications) or the applicable state utility commission (for intrastate communications). In re Establishing Just & Reasonable Rates for Local Exchange Carriers, 2007 WL 2872755, 22 F.C.C.R. 17989, ¶ 2 (2007) (notice of proposed rulemaking). In general, CLECs may file interstate access tariffs if the rate for access service is no higher than the rate charged for such services by the competing ILEC. Id. at ¶ 10. CLECs may negotiate higher rates with IXCs. Id. Special rules apply

invoices and as a result owes Sancom at least $417,366.40. Sancom filed suit against Sprint alleging breach of contract based on Sprint's failure to pay the access charges set out in Sancom's federal and state tariffs, breach of implied contract, and unjust enrichment.

Sprint denies that it failed to pay switched access charges for services provided pursuant to Sancom's tariffs on the ground that the services provided by Sancom do not qualify as "switched access service," as that term is defined in Sancom's tariffs. Sprint's argument is based on the nature of the traffic at issue, which was originated by Sprint's long-distance customers and terminated to several companies that provide free telephone services such as conference calling, chat-line, and similar services.[2] Sprint also alleges that Sancom participated in a "traffic pumping scam" with the free calling providers under which the free calling providers stimulated long-distance calls by offering various calling services to the public free of charge. When a call was made from one of Sprint's long-distance customers to one of the free calling providers, Sancom routed the call to or through equipment owned by the free calling provider or provided by Sancom, charged Sprint the terminating switched access charge for delivering that call, and paid a portion of the charge to the free calling provider. Sprint counterclaimed against Sancom alleging

_____

to rural CLECs. Id.

[2] The court will refer to these companies collectively as "free calling providers" or "conference calling companies."

violation of 47 U.S.C. § 203(c) (§ 203(c)) based on Sancom's assessment of charges for terminating switched access services in a manner contrary to its federal tariff, breach of state tariff obligation based on Sancom's assessment of charges not provided for in its state tariff, unjust enrichment, negligent misrepresentation based on false information in invoices sent to Sprint, and civil conspiracy. Sprint requested injunctive, declaratory, and monetary relief. Sprint also filed a third-party complaint against two free calling providers, Free Conferencing Corporation of America and Telejunctions LLC, alleging unjust enrichment and civil conspiracy based on the same traffic pumping scam.

Sancom moved to dismiss Sprint's counterclaims for lack of jurisdiction, based in part on the filed rate doctrine and the primary jurisdiction doctrine. Free Conferencing Corporation of America moved to dismiss Sprint's third-party complaint for failure to state a claim upon which relief may be granted. The court denied both motions given the absence of a developed factual record and the uncertain status of Qwest Communications Corp. v. Farmers & Merchants Mutual Telephone Co. (Farmers), a proceeding before the FCC. Sprint has filed a motion for judgment on the pleadings on Sancom's breach of implied contract and unjust enrichment claims. Now, Sancom moves to stay the case and refer certain issues to the FCC. Sprint's motion for judgment on the pleadings is still pending.

## II.    Related Cases

This case is one of a number of cases pending in this court and in other courts involving a dispute between an LEC and an IXC regarding access charges associated with traffic delivered to free calling providers.  In each of these cases, an LEC claims that an IXC has wrongfully refused to pay terminating access charges for services performed pursuant to the LEC's tariffs and requests compensation under breach of contract, breach of implied contract, and/or unjust enrichment theories.  In each case, the IXC claims that the services provided were not covered by the applicable tariffs because the LEC did not "terminate" the calls and the free calling providers were not "end users" within the meaning of the tariffs.  Many of the IXCs also claim that the applicable LEC engaged in unlawful "traffic pumping."

The following cases are pending in the District of South Dakota: <u>Northern Valley Communications, LLC v. MCI Communications Services, Inc. d/b/a Verizon Business Services</u>, Civ. 07-1016-KES;[3] <u>Sancom, Inc. v. Qwest Communications Co.</u>, Civ. 07-4147-KES; <u>Northern Valley Communications, LLC v. Sprint Communications Co.</u>, Civ. 08-1003-KES; <u>Splitrock Properties, Inc. v. Qwest Communications Co.</u>, Civ. 08-4172-KES; <u>Sancom, Inc. v. AT&T Corp.</u>, Civ. 08-4211-KES; <u>Northern Valley Communications L.L.C. v. AT&T</u>

---

[3] <u>Northern Valley Communications, LLC v. MCI Communications Services, Inc., d/b/a Verizon Business Services</u>, Civ. 07-1016 is consolidated with <u>Sancom, Inc. v. MCI Communications Services, Inc., d/b/a Verizon Business Services</u>, Civ. 07-4106.

Corp., Civ. 09-1003-CBK; Northern Valley Communications L.L.C. v. Qwest
Communications Co., Civ. 09-1004-CBK; and Splitrock Properties, Inc. v.
Sprint Communications Co., Civ. 09-4075-KES.[4]  According to Sancom, there
are 9 similar cases pending in the United States District Court for the Southern
District of Iowa, 3 cases pending in the United States District Court for the
Northern District of Iowa, 2 cases pending in the United States District Court
for the Southern District of New York, and 1 case each pending in the United
States District Court for the District of Minnesota and the United States
District Court for the Western District of Kentucky.  Two of these courts have
already stayed the action pending referral of several issues to the FCC.  See
Tekstar Commc'ns, Inc. v. Sprint Commc'ns Co., Civil No. 08-1130 (JNE/RLE),
2009 WL 2155930 (D. Minn. July 14, 2009); All Am. Tel. Co., Inc. v. AT&T,
Inc., 07 Civ. 861 (WHP), Docket 88 (Jan. 19, 2010).  Motions to stay and refer
certain issues to the FCC are pending in several of the Southern District of
Iowa cases.

## III.   **Farmers**

Similar cases are also pending before various regulatory agencies, the
most significant of which is Farmers.  Sancom's motion to stay and refer

---

[4] Motions to stay and refer issues to the FCC have been filed by the
plaintiff-CLEC in Sancom v. Qwest, Civ. 07-4147-KES; Northern Valley v.
Sprint, Civ. 08-1003-KES; Sancom v. AT&T, Civ. 08-4211-KES; Northern
Valley v. AT&T, Civ. 09-1003-CBK; and Northern Valley v. Qwest, Civ. 09-1004-
CBK.

several issues to the FCC arises out of the FCC's latest decision in Farmers.  In

Farmers, Qwest filed a complaint against Farmers and Merchants Mutual

Telephone Company (Farmers), an ILEC in Iowa, alleging that Farmers violated

§ 201(b) by earning an excessive rate of return as a result of its plan to increase

dramatically the amount of terminating access traffic delivered to its exchange

via agreements with conference calling companies.  Qwest Commc'ns Corp. v.

Farmers & Merchants Mutual Tel. Co., 2007 WL 2872754, 22 F.C.C.R. 17973,

¶ 1 (2007) (memorandum opinion and order) ("Farmers I").  Qwest also alleged

that Farmers violated § 203(c) and 47 U.S.C. § 201(b) by assessing switched

access charges for services that were not switched access.  Id.  In October

2007, the FCC issued its memorandum opinion and order in Farmers I, ruling

that Farmers violated § 201(b) by receiving an unlawfully high rate of return,

but declining to award Qwest damages because Farmers' tariff was deemed

lawful.  Id. at ¶¶ 25-26.  The FCC also rejected Qwest's argument that Farmers

violated § 203(c) and § 201(b) by imposing terminating access charges on traffic

that Farmers did not, in fact, terminate because, the FCC found, Farmers did

"terminate" the traffic and the conference calling companies were "end users"

as defined in Farmers' tariff.  Id. at ¶¶ 30, 35.  Qwest filed a petition to

reconsider challenging various aspects of Farmers I.

In January 2008, the FCC granted in part Qwest's petition for partial

reconsideration based on Qwest's assertions that Farmers falsely represented

that the conference calling companies purchased interstate End User Access

Service and paid the federal subscriber line charge and that Farmers

backdated contract amendments and invoices to make it appear that the

conference calling companies had been purchasing tariffed services.  Qwest

Commc'ns Corp. v. Farmers & Merchants Mutual Tel. Co., 2008 WL 246393,

22. F.C.C.R. 1615, ¶¶ 3, 6 (2008) (order on reconsideration).  The FCC stated

that it granted this motion for partial reconsideration because its finding in

Farmers I that the conference calling companies were end users under

Farmers' tariff was based on the above-mentioned representations made by

Farmers.  Id. at ¶ 6.  The FCC ordered Farmers to produce all of the documents

it produced in a related state utilities board proceeding, including documents

relating to the decision to backdate contract amendments and invoices.  Id. at

¶ 8.

In November 2009, the FCC issued its second order on reconsideration

and ruled that the evidence brought to light pursuant to Qwest's petition for

reconsideration warranted a change in its original ruling and compelled the

conclusion that Farmers violated § 203(c) and § 201(b).  Qwest Commc'ns

Corp. v. Farmers & Merchants Mutual Tel. Co., No. EB-07-MD-001, 2009 WL

4073944, ¶ 1 (FCC Nov. 25, 2009) (second order on reconsideration)

("Farmers II").[5]  The FCC found that the conference calling companies did not

---

[5] Qwest did not challenge the FCC's finding in Farmers I that Farmers
terminated the traffic at issue, so Farmers II did not address this issue.
Farmers II, 2009 WL 4073944 at ¶ 6 n.29.

subscribe to the services offered under Farmers' tariff, so they were neither "customers" nor "end users" within the meaning of the tariff and Farmers was not entitled to charge Qwest switched access charges. Id. at ¶ 10. As a result, the FCC found that Farmers' practice of charging Qwest access charges for the traffic relating to the conference calling companies was unjust and unreasonable in violation of § 201(b). Id. at ¶ 26. The FCC stated that the amount of any damages would be calculated in a separate proceeding and suggested that its ruling that the services Farmers provided did not qualify as "switched access services" under Farmers' tariff did not mean that Farmers was entitled to no compensation for these services. Id. at ¶ 24 n.96.[6]

## DISCUSSION

Sancom moves to stay the case and refer specific issues to the FCC pursuant to the primary jurisdiction doctrine. "Primary jurisdiction is a common-law doctrine that is utilized to coordinate judicial and administrative decision making." Access Telecomms. v. Southwestern Bell Tel. Co., 137 F.3d 605, 608 (8th Cir 1998). The doctrine "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have

---

[6] Sancom challenges the validity and precedential value of Farmers II on the grounds that the opinion is subject to further petitions for reconsideration, was untimely, and cannot be considered a proper "reconsideration" because three of the Commissioners who decided Farmers II were new since the FCC decided Farmers I. Because it is not necessary for the court to apply Farmers II in this order, it does not address Sancom's attacks on the opinion.

been placed within the special competence of an administrative body."
Alpharma, Inc. v. Pennfield Oil Co., 411 F.3d 934, 938 (8th Cir. 2005) (internal quotation and citation omitted).

There is no fixed formula for deciding whether to apply the doctrine of primary jurisdiction.  Access Telecomms., 137 F.3d at 608 (citing United States v. Western Pac. R.R. Co., 352, U.S. 59, 64 (1956)).  Rather, the applicability of the doctrine in any given case depends on "whether the reasons for the doctrine are present and whether applying the doctrine will aid the purposes for which the doctrine was created." Id.  The Eighth Circuit has identified two main reasons and purposes for the doctrine: first, and most common, "the use of agency expertise in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion," and second, the "promot[ion] of uniformity and consistency within the particular field of regulation." Alpharma, 411 F.3d at 938 (internal quotation omitted); Access Telecomms., 137 F.3d at 608; see also United States v. McDonnell Douglas Corp., 751 F.2d 220, 224 (8th Cir. 1984) ("The doctrine of primary jurisdiction . . . should seldom be invoked unless a factual question requires both expert consideration and uniformity of resolution." (internal quotation and citation omitted)).  The Eighth Circuit warns that the doctrine "is to be 'invoked sparingly, as it often results in added expense and delay.' " Alpharma, 411 F.3d at 938 (quoting Red Lake Band of Chippewa Indians v. Barlow, 846 F.2d 474, 477 (8th Cir. 1988)).  When the primary jurisdiction

doctrine applies, the "district court has discretion either to [stay the case and] retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." Access Telecomms., 137 F.3d at 609 (internal quotation and citation omitted, alteration in original).

Sancom proposes that the court refer three issues to the FCC: (1) determination of whether Sancom is entitled to collect switched access charges for calls to numbers assigned to free calling providers pursuant to its interstate access tariff; (2) if Sancom's interstate access tariff does not apply to the services at issue, determination of the proper legal classification of these services and determination of whether Sancom is entitled to compensation for them; and (3) determination of a reasonable rate for these services. The court finds that the reasons for applying the primary jurisdiction doctrine are present and that applying the doctrine will aid the purposes for which the doctrine was created with respect to each issue.[7]

## A.    Application of Tariff

The first issue Sancom asks the court to refer to the FCC is the question of whether the service that Sancom provided with respect to the free calling

_____

[7] Sprint argues that Sancom's motion is barred by the court's order denying Sancom's motion to stay the case and refer Sprint's counterclaims to the FCC. The ever-increasing number of cases and inconsistent judgments in this field has convinced the court that referral of specific issues to the FCC pursuant to the primary jurisdiction doctrine is necessary despite the court's refusal to refer Sprint's counterclaims in this case and the defendant-IXC's counterclaims in Northern Valley v. MCI, Civ. 07-1016-KES, Docket 76 at 21-22 (D.S.D. June 26, 2008).

provider traffic at issue in this case qualifies as "switched access service" within the meaning of Sancom's interstate access tariff. This is essentially a tariff interpretation and enforcement question. An action to enforce a tariff is properly brought before a court. Access Telecomms., 137 F.3d at 609. "Ordinarily, the construction of a tariff is a matter of law for the Court, being no different than the construction of any other written document." United States v. Great N. Ry. Co., 337 F.2d 243, 246 (8th Cir. 1964). But where " 'words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application,' . . . the issue should first go to the appropriate administrative agency." Access Telecomms., 137 F.3d at 609 (quoting Western Pac., 352 U.S. at 66). "The reason is plainly set forth: such a 'determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of [the regulated area] is indispensable, and such acquaintance is commonly to be found only in a body of experts.' " Western Pac., 352 U.S. at 66 (quoting Great N. Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 291 (1922)).

Where interpretation of the relevant tariff is straightforward, the primary jurisdiction doctrine does not apply. For example, in National Communications Ass'n, Inc. v. American Telephone & Telegraph Co., 46 F.3d 220, 223 (2d Cir. 1995), the threshold question of whether the plaintiff qualified for services under the tariff in turn depended on the factual question of whether the

plaintiff had timely paid its bills. The Second Circuit reasoned that this issue could be resolved by the district court in a reasonable amount of time and did not require the FCC's policy experience or specialized knowledge. Id. Thus, the primary jurisdiction doctrine did not apply. Id. at 225.

In contrast, where the interpretation of the tariff requires interpretation of technical terms or specialized knowledge, referral under the primary jurisdiction doctrine is appropriate. For example, in Access Telecommunications, 137 F.3d at 609, the Eighth Circuit reasoned that the plaintiff's claim that the defendant carrier violated the plaintiff's tariff was properly referred to the FCC because application of the tariff would cause the court "to become embroiled in the technical aspects" of voice grade 7, the service at question, and the FCC had more expertise than the courts on the relevant issues of circuit designs, signal transmission, noise attenuation, and echo return loss.[8] Similarly, in United States v. Great Northern Railway Co., 337 F.2d at 246-47, the Eighth Circuit found that the phrase "transit privileges" in the relevant tariff "had a particular connotation in the rail transportation field, being a generic term requiring specific definition" and as

---

[8] In Access Telecommunications, 137 F.3d at 609, the plaintiff's tariff claim required determination of the reasonableness of the defendant carrier's classification, a determination clearly within the FCC's authority under § 201(b). But the Eighth Circuit did not indicate that the propriety of the application of the primary jurisdiction doctrine depended on the presence of a reasonableness determination.

such was a matter for primary determination by the applicable regulatory agency.[9]

Here, application of Sancom's switched access tariff requires interpretation of words used in a technical sense and consideration of extrinsic evidence relating to topics within the expertise of the FCC. Under Sancom's interstate access tariff,

> Switched Access Service, which is available to customers for their use in furnishing their services to end users, provides a two-point communications path between a customer designated premises and an end user's premises. . . . Switched Access Service provides for the ability to originate calls from an end user's premises to a customer designated premises, and to terminate calls from a customer designated premises to an end user's premises in the LATA where it is provided.

Tariff F.C.C. No. 1, Docket 10-2, § 6.1. Thus, in order for the services provided by Sancom to qualify as "switched access services," Sancom must terminate the calls to an "end user's premises." That is, the free calling providers must qualify as "end users." Sancom's interstate access tariff defines "end user" as "any customer of an interstate or foreign telecommunications service that is not a carrier." Id. at § 2.6. "Customer," in turn, is defined as "any individual, partnership, association, joint-stock company, trust, corporation, or governmental entity or any other entity which subscribes to the services offered

---

[9] In United States v. Great Northern Railway Co., 337 F.2d at 247-48, the Eighth Circuit found that there was no need to refer the case to the Interstate Commerce Commission because the Commission had sufficiently defined the term in previous opinions to which the district court was required to give the greatest deference and weight.

under this tariff, including both Interexchange Carriers (ICs) and End Users."
Id. Sancom's interstate access tariff does not define "subscribe."

Determination of whether the free calling providers qualify as "end users" under Sancom's interstate access tariff would embroil the court in the technical aspects of switched access service. In Farmers II, the FCC interpreted the same tariff language at issue here. See Farmers II, 2009 WL 4073944 at ¶ 10 (setting out definitions of switched access service, end user, and customer). Thus, the FCC's analysis in Farmers II sheds light on the issues the court would be called on to resolve if it interpreted Sancom's interstate access tariff in this case. In Farmers II, the FCC considered the different connections Farmers provided to the conference calling companies versus the customers of its tariffed service. The FCC explained that "Farmers provided the conference calling companies with high-capacity DS3 trunks that fed into trunk-side connections, to a brand new 'soft switch' that Farmers purchased specifically to handle traffic bound for the conference calling companies." Id. at ¶ 13. Farmers used a Nortel DMS-10 circuit switch to serve all of its other customers. Id. The import and meaning of the different types of connections provided to different customers is an issue the FCC is more qualified than the court to consider. See Access Telecomms., 137 F.3d at 609 (explaining that the FCC has more expertise than the courts on matters such as circuit designs, signal transmissions, noise attenuation, and echo return loss).

The FCC also found that Farmers' agreements with the conference calling companies did not resemble traditional agreements for the provision of switched access services in that the agreements included exclusivity clauses and other unique terms not available under Farmers' tariff, required Farmers to pay the conference calling companies a given and unique sum per minute of traffic that Farmers delivered, and obligated each conference calling company to generate different amounts of traffic.  <u>Farmers II</u>, <u>2009 WL 4073944 at ¶ 14</u>. The FCC is uniquely qualified to compare the terms of an agreement between an LEC and a conference calling company with the terms of a traditional agreement for the provision of tariffed access services because of the FCC's experience in the field.

Similarly, the FCC considered Farmers' failure to enter the conference calling companies' account information into its customer billing systems in accordance with its standard business practices for tariffed services, Farmers' failure to bill the conference calling companies for monthly services, Farmers' conduct throughout its business relationships with the conference calling companies, and the flow of money between Farmers and the conference calling companies.  <u>Id.</u> at ¶¶ 12 n.49, 16, 17.  An adequate appreciation of the relevance of these and other facts relating to an LEC's relationship with a conference calling company requires acquaintance with the many intricate facts of the normal practices and regulatory regime for switched access service.

Based on the FCC's analysis in Farmers II and the specific and technical meaning of the terms "switched access service," "end user," "customer," and "subscribe," the court finds that the issue of whether the services Sancom provided to Sprint in this case qualify as "switched access services" under Sancom's interstate tariff is a matter that requires the expertise of the FCC. "The courts, while retaining the final authority . . . should avail themselves of the aid implicit in the agency's superiority in gathering the relevant facts and in marshaling them into a meaningful pattern." United States v. Great N. Ry. Co., 337 F.2d at 246 (internal quotation and citation omitted).

Sprint argues that the guidance provided by the FCC in Farmers II is sufficient to avail the court of the FCC's expertise so that referral of the issue of the application of Sancom's tariff to the services at question in this case is unnecessary. Indeed, the Supreme Court has explained, "[c]ertainly there would be no need to refer the matter of [tariff] construction to the Commission if that body, in prior releases or opinions, has already construed the particular tariff at issue or has clarified the factors underlying it." Western Pac., 352 U.S. at 69; see also Great N. Ry. Co., 337 F.2d at 247-48 (explaining that where Interstate Commerce Commission had sufficiently defined "transit privileges" in previous opinions, the primary jurisdiction doctrine had been satisfied and there was no need to refer the case to the Commission).

Here, the court finds that Farmers II does not provide sufficient guidance to render referral unnecessary. Farmers II made clear that the application of

the tariff is a fact-specific question. The type of connection and nature of the relationship between Sancom and the free calling providers may differ from the facts of <u>Farmers II</u> so that the FCC's expertise is still necessary in this case. Further, many of the details of Farmers' billing practices and conduct were redacted from the FCC's opinion in <u>Farmers II</u>, and as a result, the opinion provides the court with the FCC's conclusion rather than the key facts supporting that conclusion. <u>See</u> <u>Farmers II</u>, <u>2009 WL 4073944 at ¶¶ 16, 18-20</u> (redacting confidential information regarding Farmers' billing practices, Farmers' efforts to backdate and amend its agreements, and Farmers' relationship with the conference calling companies). Thus, there remain technical issues on which the FCC has not provided sufficient guidance. Finally, <u>Farmers II</u> resolved the tariff question with respect to an ILEC rather than a CLEC, and the FCC has not provided guidance on the impact of the detariffing regime for CLECs on this issue. <u>See</u> <u>In re Access Charge Reform, 2001 WL 435698, 16 F.C.C.R. 9923 (2001)</u> (seventh report and order and further notice of proposed rulemaking) (adopting detariffing regime for CLECs). As the District of Minnesota explained, "the Court anticipates that review of the myriad factors involved in the process of establishing tariffs will be significant to gauging the scope of [plaintiff-LEC's] tariff." <u>Tekstar, 2009 WL 2155930, at *2</u> (citing <u>In re Establishing Just & Reasonable Rates for Local Exchange Carriers, 2007 WL 2872755, 22 F.C.C.R. 17989, 17992-94 (2007)</u> (notice of proposed rulemaking); <u>47 C.F.R. § 61.26</u>). Thus, <u>Farmers II</u> does not obviate

the need for a primary jurisdiction referral of the tariff application issue in this case.

Referral of the tariff application issue would also promote uniformity and consistency within the particular field of regulation. Because there are currently about two dozen cases pending in federal courts across the country involving the issue of whether the connection of long-distance calls through an LEC's facilities to conference calling companies constitutes "switched access service" under the applicable access tariffs, the court finds that the potential for inconsistent or contradictory rulings on this issue is great. Indeed, the FCC and the Iowa Utilities Board (IUB) have reached partially inconsistent conclusions on the tariff application issue. As noted, the FCC reversed its course between <u>Farmers I</u> and <u>Farmers II</u> and found that the conference calling companies were not "end users" under Farmers' tariff. The IUB considered intrastate traffic involving many of the same parties as <u>Farmers I</u> and <u>Farmers II</u> and found that the conference calling companies did not subscribe to the services offered in the LECs' intrastate access tariffs and therefore were not end users under the tariffs. <u>In re Qwest Comm'cns Corp. v. Superior Tel. Coop.</u>, Docket No. FCU-07-2 at 24, 2009 WL 3052208, at *10 (Iowa Utils. Bd. Sept. 21, 2009) (final order). This finding is consistent with <u>Farmers II</u>. But the IUB also found that the calls to the conference calling companies did not terminate in the LECs' exchanges, which is inconsistent with <u>Farmers I</u> and

<u>Farmers II</u>.  Docket No. FCU-07-2 at 42, 2009 WL 3052208, at *19.[10]  The

inconsistencies between <u>Farmers I</u> and <u>Farmers II</u> and the IUB'S final order

shows that the risk of inconsistent and contradictory rulings on the tariff

application issue is great, even in light of the guidance provided by existing

agency decisions.  The purposes of the primary jurisdiction doctrine support

referral of the tariff application issue.

### B.    Classification of Services

The second issue Sancom asks the court to refer to the FCC is, if

Sancom's interstate access tariff does not apply to delivery of calls to the free

calling providers, what is the proper legal classification of these services and is

Sancom entitled to compensation for them.  The FCC's expertise is necessary to

determine whether Sancom is entitled to compensation for services not covered

by its tariffs.  The FCC has partially deregulated the environment in which

CLECs provide access service, and the determination of the impact of such

deregulation on the compensation issues in this case is better entrusted to

FCC than to the courts.  In 2001, the FCC adopted a detariffing regime for

CLECs.  <u>In re Access Charge Reform, 16 F.C.C.R. 9923</u>.  The FCC established

"a benchmark level at which CLEC access rates will be conclusively presumed

to be just and reasonable and at (or below) which they may therefore be

---

[10] Sancom challenges the validity of the IUB's final order on several
grounds.  Because the court relies on the final order only to show the need for
uniformity and consistency in this area, the court does not address Sancom's
challenge to the merits of the opinion.

tariffed. Above the benchmark, CLECs will be mandatorily detariffed." Id. at

¶ 40. CLECs can negotiate with IXCs to set rates above the benchmark. Id. at

¶¶ 3, 43. The FCC also created an exemption for rural CLECs competing with

non-rural ILECs that allowed such CLECs to charge access rates above the

benchmark applicable to all other CLECs. Id. at ¶ 73. The FCC further

clarified the rules governing the provision of access services by CLECs in In re

Access Charge Reform, 2004 WL 1103977, 19 F.C.C.R. 9108 (2004) (eighth

report and order and fifth order on reconsideration). Given the FCC's role in

establishing and regulating the partially deregulated regime for CLECs, the

ways in which CLECs can obtain non-tariffed rates through agreements with

IXCs are matters for the FCC to determine.

Further, the FCC suggested in Farmers II that an ILEC may obtain

compensation from an IXC to which it provided services even though the

services did not qualify as "switched access services" under the ILEC's access

tariff. In Footnote 96, the FCC stated,

> This is not to say that Farmers is precluded from receiving any
> compensation at all for the services it has provided to Qwest. See,
> e.g., New Valley Corp. v. Pacific Bell, Memorandum Opinion and
> Order, 15 FCC Rcd 5128, 5133, ¶ 12 (2000) (fact that a carrier's
> tariff did not include rates or terms governing the service provided
> did not mean that the customer was entitled to damages equal to
> the full amount billed; rather "where, as here, the carrier had no
> other reasonable opportunity to obtain compensation for services
> rendered . . . a proper measure of the damages suffered by a
> customer as a consequence of a carrier's unjust and unreasonable
> rate is the difference between the unlawful rate the customer paid
> and a just and reasonable rate"), aff'g New Valley Corp. v. Pacific

Bell, Memorandum Opinion and Order, 8 FCC Rcd 8126, 8127, ¶ 8 (Com. Car. Bur. 1993) (finding no basis in the Supreme Court's "Maislin [decision] or any other court or Commission decision for the conclusion that a customer may be exempt from paying for services provided by a carrier if those services were not properly encompassed by the carrier's tariff"). See also America's Choice, Inc. v. LCI Internat'l Telecom Corp., Memorandum Opinion and Order, 11 FCC Rcd 22494, 22504, ¶ 24 (Com. Car. Bur. 1996) (holding that "a purchaser of telecommunications services is not absolved from paying for services rendered solely because the services furnished were not properly tariffed").

Farmers II, 2009 WL 4073944 at ¶ 24 n.96. The FCC has not indicated the basis for compensation of the ILEC, whether the ILEC's termination of calls to the conference calling companies was subject to federal tariffing requirements, or how such calls should be classified within the regulatory scheme. Moreover, the FCC has not had an occasion to address the implication of the detariffed regime for CLECs on compensation for services that do not fall within the definition of tariffed services. These issues are properly determined by the FCC.

Sprint argues that it is inappropriate to refer the legal question of whether Sancom's state-law theories of recovery are barred by the filed rate doctrine. Legal questions are for the court to determine because "there are no issues requiring the views of the administrative agency." Interstate Commerce Comm'n v. Chicago, Rock Island & Pacific R.R. Co., 501 F.2d 908, 913 (8th Cir. 1974). The Supreme Court has held that courts are not required to defer to an agency's conclusions regarding preemption of state-law claims. Wyeth v.

Levine, 129 S. Ct. 1187, 1201, 173 L. Ed. 2d 51 (2009).  Here, the court does not intend to refer Sancom's unjust enrichment claim, the question of whether Sancom can recover under an unjust enrichment theory, or the question of whether this theory is barred by the filed rate doctrine.  Rather, the court seeks the FCC's guidance on the issues of whether the services Sancom provided in this case are subject to the tariff requirements, where these services fall into the regulatory regime, and how Sancom can obtain compensation for these services if its access tariff does not apply.  While the FCC's answer to these questions may implicate the court's determination of whether the filed rate doctrine bars recovery pursuant to an unjust enrichment theory, the court does not ask the FCC to make this legal determination.[11]

Referral of the issue of the classification of the services provided by Sancom also promotes uniformity and consistency.  There is disagreement among courts in this district over whether an LEC may recover under an unjust enrichment theory.  Compare Sancom, Inc. v. Qwest Comm'cns Corp., 643 F. Supp. 2d 1117, 1125-27 (D.S.D. 2009) (finding unjust enrichment claim to be barred by the filed rate doctrine) and Splitrock Props., Inc. v. Qwest Comm'cns Corp., Civ. 08-4172-KES, Docket 28 at 3 (D.S.D. Aug. 28, 2009)

_____

[11] Because the court retains jurisdiction over the underlying claims in this case, the court need not address Sprint's argument that Sancom's unjust enrichment claim is barred by collateral estoppel.  The court's order dismissing Sancom's unjust enrichment claim in Sancom, Inc. v. Qwest Communications Corp., 643 F. Supp. 2d 1117 (D.S.D. 2009) has no bearing on the propriety of referring specific issues to the FCC in this case.

(same) with [Northern Valley Commc'ns, LLC v. Qwest Commc'ns Corp., 659 F. Supp. 2d 1062, 1070 (D.S.D. 2009)](#) (finding that filed rate doctrine does not defeat unjust enrichment claim where it is alleged that tariff does not apply). While the court does not refer this legal question to the FCC, the inconsistent rulings show the need for clarification by the FCC on how a CLEC may be compensated for services provided outside of its tariffs. The purposes of the primary jurisdiction doctrine support referral of the service classification issue.

###    C.    Reasonable Rate

The third question Sancom asks the court to refer to the FCC is, if Sancom's interstate access tariff does not apply to the services at issue, but Sancom is entitled to compensation for these services, what is the reasonable rate. It is well established that the FCC is specially positioned to determine the reasonableness of rates. See, e.g., [Qwest Corp. v. Scott, 380 F.3d 367, 375 (8th Cir. 2004)](#) (stating that regulating agency has authority to determine reasonableness of rates). Thus, if Sancom is entitled to compensation for the services it provided to Sprint outside of its tariffed rate, the FCC has the expertise and experience to determine the appropriate rate. See Access Telecomms., [137 F.3d at 609](#) (stating that FCC has statutory authority to make reasonableness determinations).

Sprint argues that the issue of a reasonable rate for Sancom's services should not be referred because there is no legal basis for the court or the FCC to award Sancom compensation for services that were not covered by its filed

tariff, the FCC has no power to set retroactive rates, and the FCC does not have jurisdiction over a collections action brought by a carrier. There is some authority to support Sprint's position. See Union Tel. Co. v. Qwest Corp., 495 F.3d 1187, 1197 (10th Cir. 2007) (finding that carrier cannot recover damages under a theory of unjust enrichment where it failed to file a tariff or enter into reciprocal compensation agreement as required by 47 U.S.C. § 251(b)(5)); MCI WorldCom Network Servs., Inc. v. Paetec Commc'ns, Inc., No. Civ.A.04-1479, 2005 WL 2145499, at *5, (E.D. Va. Aug. 31, 2005) ("The Supreme Court has stated that the filed tariff doctrine explicitly prohibits a carrier from collecting charges for services that are not described in its tariff."), aff'd, 204 Fed. Appx. 271 (4th Cir. 2006); ACC Long Distance Corp. v. Yankee Microwave, Inc. 1993 WL 755637, 8 F.C.C.R. 85, ¶ 10 (1993) (memorandum opinion and order) ("The Commission's authority to determine and prescribe just and reasonable rates derives from Section 205 of the Act which authorizes rates to be prescribed only on a prospective basis."). But as noted, the FCC suggested in Footnote 96 of Farmers II that an LEC may be entitled to some compensation for services it provides to an IXC even if the services do not fall under the LEC's tariff. Farmers II, 2009 WL 4073944 at ¶ 24 n.96. In the absence of further analysis from the FCC regarding the basis for such compensation, the court cannot say that the FCC is without jurisdiction to determine an appropriate rate or amount of compensation. Sprint argues that the authority cited in Footnote 96 does not provide a legal basis for the FCC to award compensation to Farmers.

The FCC has not issued an opinion on the damages portion of the <u>Farmers</u> proceeding, so the legal basis for the FCC's statement in Footnote 96 that Farmers may be entitled to some compensation is not yet clear.  Given the posture of <u>Farmers II</u>, the court finds that the purposes of the primary jurisdiction doctrine are best served by allowing the FCC to determine whether, under what basis, and at what rate an LEC is entitled to be compensated for delivering long-distance traffic to free calling providers on behalf of IXCs like Sprint where the service does not fall under the applicable switched access tariff.

Sprint argues that it would be premature to refer the classification of services and reasonable rate issues to the FCC because the FCC may not reach these issues.  Sprint is correct that in some cases, the FCC declines to answer all of the issues referred to it by a district court.  <u>See, e.g.</u>, <u>In re Petitions of Sprint PCS & AT&T Corp., 2002 WL 1438578, 17 F.C.C.R. 13192 (2002)</u> (declaratory ruling) (setting out circumstances in which carrier can charge access fees for access to carrier's wireless network but deferring to court to answer question of whether contract existed under state law).  Thus it is possible that the FCC will not reach the issues of the classification and reasonable rate for the services in question.  But the court has found that if resolution of this action requires determination of these issues, then they should be referred to the FCC pursuant to the primary jurisdiction doctrine.  Referring all of the issues at one time promotes efficiency and reduces delay.

The court will draft the language of the issues to be referred to make it clear that the FCC should only consider the classification of services issue if it has jurisdiction to do so and if its analysis on the tariff interpretation issue requires determination this issue. Likewise, the court will make clear that the FCC should only consider the reasonable rate issue if it has jurisdiction to do so and its analysis on the tariff interpretation and classification of services issues requires determination of the reasonable rate.

Overall, the reasons for the primary jurisdiction doctrine are present in this case so that applying the doctrine will aid the purposes for which it was created.[12] The court has considered the added expense and delay that may

---

[12] Sprint argues that the court should delay referring any issues to the FCC until the issues are crystallized through discovery. But the record before the court shows that the tariff application, classification of services, and reasonable rate issues should be referred to the FCC pursuant to the primary jurisdiction doctrine at this stage of the case. There is no need to wait for discovery to begin. "[I]f . . . the primary jurisdiction doctrine applies on any set of facts that could be developed by the parties, there is no reason to await discovery, summary judgment, or trial and the application of the doctrine properly may be determined on the pleadings." Davel Comm'cns, Inc. v. Qwest Corp., 460 F.3d 1075, 1089 (9th Cir. 2006).

Similarly, Sprint's argument that these issues should not be referred because discovery is limited in the FCC is unavailing. The expansiveness of the regulatory agency's discovery rules is not a consideration of the primary jurisdiction doctrine. Indeed, if Sprint were to prevail on its argument, then courts would never be able to refer issues to the FCC pursuant to the primary jurisdiction doctrine. Such a result cannot be squared with the rule that the primary jurisdiction doctrine should be utilized when the reasons for the doctrine are present. Access Telecomms., 137 F.3d at 608. Further, there is no evidence that the scope of discovery provided for in the FCC's rules would prevent Sprint from discovering relevant evidence. Even the documents

result from the primary jurisdiction referral, but finds that the need for expert consideration, uniformity, and consistency within this complicated, technical, and dynamic field compels referral of specific issues to the FCC. The court agrees with the Southern District of New York that "[t]his area of telecommunication regulation is in dynamic flux . . . [so] these issues . . . are ripe for determination and clarification by the regulatory agency." All Am. Tel. Co., 07 Civ. 861 (WHP), Docket 88 at 3 (citing Allnet Commc'n Servs., Inc. v. Nat'l Exchange Carrier Assoc., 965 F.2d 1118, 1121 (D.C. Cir. 1992)). Thus, the court will stay the case and order the parties to initiate the proper proceedings with the FCC.

## II.     Motion to Reconsider

The caption of Sancom's motion states that it is also a motion for reconsideration. Neither Sancom's motion nor its memorandum in support of motion identify which court order Sancom wants reconsidered. Therefore, the portion of the motion seeking reconsideration is denied.

Based on the foregoing, it is hereby

ORDERED that Sancom's motion for reconsideration is denied, and its motion to stay the case for referral of issues to the FCC (Docket 97) is granted. This action is STAYED pending (1) resolution of the dispute by agreement of

_____

withheld in Farmers, that, once discovered, persuaded the FCC to reverse its decision, should have been produced pursuant to the FCC's discovery order. 23 F.C.C.R. 1615 at ¶8.

the parties; (2) a decision on the disputed issues by the FCC pursuant to the referral described below; or (3) further order of the court.

IT IS FURTHER ORDERED that this matter is referred to the FCC for resolution, to the extent the FCC's jurisdiction permits, of the following issues:

(1)     Whether, under the facts of the present dispute between Sancom and Sprint, Sancom is entitled to collect interstate switched access charges it has billed to Sprint pursuant to Sancom's interstate access tariff for calls to numbers assigned to free calling providers.

(2)     In the event that the services provided by Sancom to Sprint, by which calls placed by Sprint's customers are delivered to free calling providers served by Sancom, do not qualify as switched access service under Sancom's applicable interstate access tariff, determination of the proper classification of these services, whether such services are subject to federal tariffing requirements, and whether Sancom is entitled to obtain compensation for these services.

(3)     In the event that the services provided by Sancom to Sprint do not qualify as switched access service under Sancom's applicable interstate access tariff, but Sancom is otherwise entitled to compensation for these services, determination of a reasonable rate for these services.

IT IS FURTHER ORDERED that Sancom shall contact the Market Disputes Resolution Division of the FCC to obtain guidance regarding the appropriate method for bringing this matter before the FCC.  Sancom shall initiate proceedings as recommended by the Market Disputes Resolution Division within 30 days of the date of this order.  Sancom is directed to furnish the FCC with a copy of this order as part of its submission.

IT IS FURTHER ORDERED that the parties shall submit a joint report to the court every 3 months describing the status of the proceeding before the FCC, the first of which shall be filed no later than 3 months from the date of this order.

IT IS FURTHER ORDERED that Sancom's request for oral argument on its motion to stay (Docket 102) is denied as moot.

Dated March 15, 2010.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
CHIEF JUDGE